No, but I mean, I didn't realize that there's a case coming up with what you just said. Well, maybe, but we have a statute. No, I'm just saying I didn't realize there was a case coming up. I think this week. I think it's on the calendar. That's what I'm saying. I didn't realize there was a case on the calendar. I don't think that affects anything. Oh, no, no, I'm just saying I didn't realize there was such a case. Yes. Okay. Next argue cases number 19 to 91. S. C. H. Steel Vena Corporation against the United States. Mr. Vincent. Morning, Your Honor. Your Honors. My name is Jeffrey Winton on behalf of say a steel Vena Corporation. So, Vena is a Vietnamese producer of various pipe products, including the pipe that goes down into oil wells, which is known as a CGG. Commerce has designated Vietnam as a non-market economy or NME. And that means... Well, you argue that Vena's freight forward contract was not an insurance contract. And that the commerce erred by undertaking, as you put it, metaphysical inquiries into the nature of services provided by your freight forwarder. Can you point to any record evidence outside your freight forwarder contract that indicates it isn't also for insurance? Your Honor, I would submit, and I will answer your question, but I would submit that's irrelevant. Because there's no question about what that contract said. That contract said the freight forwarder will provide freight, and it will be reliable for any damages while the merchandise is being transported. There's no dispute about that. The question then is, given that that's what we bought in Vietnam, what would it cost us to buy that in India? That was the only question here. It wasn't whether you can call this an insurance contract. That's irrelevant under the statute. So you fall back on English common law? No, actually, it's not just English common law. It's English common law going back 400 years, but it's also Indian law. Indian law, which we cited in our brief at page 11, note 12. And I would note that Indian law, I had in my mind this old notion that foreign law was a question of fact. I don't know where I got that, but in fact, under the Federal Rules of Civil Procedure, foreign law is a question of law to be determined by the court based on submissions by the parties, but also, if necessary, by the court's own research. So our argument here is this was very simple. You looked at what we bought in Vietnam, where the trucking company was liable for damage during freight. You said, what would you have to buy in India to get that? And U.S. Steel said, well, you'd have to buy a freight contract and an insurance contract. And we said, no. As a matter of law, in fact, a freight contract in India makes the trucking company liable for any damage during transport. They cannot avoid that liability. Therefore, if you want to know what would it cost us to get in India where the trucking company was liable for damages during freight, all we needed to do was get a trucking contract. If you add insurance on top of that, you're double counting, because the trucking company in India is already providing that insurance against loss. Whether you want to call it insurance or not doesn't matter. This isn't a question of how you interpret the Vietnamese contract. Nobody's disputed how you interpret the Vietnamese contract. The question was, how do you value those services in India? And as we said, that's a question of – actually, it turns out to be a question of foreign law, Indian law, which derives from the common law. And I apologize, but it's a little antiquarian. I'd love to go back to Coke on Littleton. I apologize, but I had fun doing that, so if you don't mind. I hope so. And so we think Judge Goldberg got hung up on the wrong issue. And then Commerce, when given the chance, never said that their initial decision was wrong. Their initial decision agreed with us. They never said that was wrong. They just said, okay, yeah, it's an insurance contract, and went from there, but never asked what did we buy in Vietnam, what would we have to pay in India to get the same services. If I may move on to the next slide. Are you straightforward with contracts, FOB? So, no. So, we – Sayavina sells to its U.S. affiliate on, I believe, a FOB Vietnamese port basis. The U.S. affiliate is responsible for insurance in, I believe, ocean freight. Sayavina is responsible for getting it to the port. And so it hires the freight forwarder to take care of transporting it to the port. The freight forwarder also takes care of the customs formalities at the port. And it's all in a contract. It's one amount fixed fee for all of that. But we don't sell to the freight forwarder. We sell to SSA, the U.S. affiliate, and that's on an FOB, Vietnamese port basis. The next issue we've raised relates to the ratios that Commerce used to determine surrogate overhead and general administrative expenses and interest expenses and profit. And here, again, I think the court below got the issue wrong. And, you know, of course, I shouldn't blame the court. It's ultimately my fault for not getting them to focus on the right issue. Commerce – The U.S. still put agri-debt – Oh, that's back to – yes. Back on insurance, yes. Yeah. Put agri-debt in. You had an opportunity to rebut it. Yes and no. The way Commerce does this, we submit our questionnaire responses. Thirty days before Commerce makes its preliminary determination, everybody puts in their surrogate value information. You're then given an opportunity to rebut that information. At that time, we said we don't have inland insurance. Why? Because we have – we don't, right? They put in an illegible document and said this is inland insurance. In fact, it wasn't inland insurance. The number they put in was insurance for mushrooms that went from the – wherever you grow mushrooms in India all the way to the United States. It was not an inland insurance. We – okay, maybe we should have been psychic and said, aha, somewhere down the road somebody's going to reclassify a simple freight contract as an insurance contract, and then Commerce is going to see – You don't have to waste any more time on that. I see what you're saying. Okay. So on the ratios, the court seemed to think the question was, could Commerce reasonably say that getting the profit figure correct was more important than getting the other figures overhead in G&A correct? And, you know, we can argue about that, and I'm not sure that that was right, but that's not the issue. Commerce said, you know, we have all these financial statements, but the only one that gives us an OCTG profit is this Bouchon, and Commerce recognized that Bouchon distorted overhead in S&A because Bouchon was an integrated producer that started with iron ore and coke and coal and made liquid steel and all that stuff. You say in the Gregory, you say the CIT was, quote, simply wrong when it held you failed to exhaust your arguments concerning Bouchon. Yes. And then you correct the CIT's characterization of your argument. But you don't establish that you raised those arguments before Commerce. Where did you raise them? We absolutely did. Give me your records. And you can do it on these. Okay, let me look it up. We absolutely did tell Commerce. But also, beyond that, you know, you have to – it's great for the judge to say you didn't exhaust the record. Sorry, I should not be angry about this, but I am angry about this, and I apologize. What happened here was we get into this case, Commerce says we're going to use a company called Wellspun as the source of profit. And then in the Korean case, they said, well, actually, Wellspun doesn't produce OCTG. So we say, there's something wrong here. It goes back to Commerce. Commerce issues a draft determination. It says, well, actually, we have two Indian producers who make OCTG. There's Apollo, and there's Bouchon. That's their draft. And we say, well, between those two, you should use Apollo for various reasons, including that OCTG is a small part of Bouchon's operations, and it's an integrated producer. Commerce then sends the remand determination to the court, which says, no, we've decided to use both Apollo and Bouchon. And we submit a letter to Commerce saying, well, that's great. Put you in your calculations. You only use Bouchon. And Commerce said, oh, gosh, it was a mistake. We sent the wrong determination to the court. And so they send a new determination to the court. Where in this process was I supposed to know that they were going to use Bouchon over Apollo? You know, it's great to say I should have been a mind reader on this, but, in fact, we addressed Commerce's decision. They said they were going to use Apollo and Bouchon. We said Apollo was better. You know, but we did address this. Because between Apollo and Bouchon, neither of them is a perfect fit here. Right. And so isn't there some degree of discretion allowed to Commerce to make the call and say, well, this isn't perfect, and this isn't perfect, but, you know, all things considered, we think this is the best way to go? Absolutely. That's a hard call for us to overturn, as it was for the CIT. Well, I think that's absolutely right. If you had a situation where you had a company that made an OCTG and had an OCTG profit rate, but everything else was distorted, and you had companies that didn't make OCTG but got the overhead, you might say, how do I decide between these two? That was not the issue before Commerce. Because Bouchon, if it produced OCTG, and we don't know if it did, if it did, its OCTG production was insignificant. You can work through the numbers. They're in our brief. They're in their financial statements. At most, it's 4% that we can't account for. And it's much likely less than 4% of Bouchon's total sales were OCTG. So you have a company, you look at its financial statement, at least 96%, maybe 100% of their sales are not OCTG. Their profit is not OCTG. And Commerce said, well, if it is OCTG, it's an insignificant part of the profit. And Commerce said, we've got to use that. Even though we know it distorts everything else, there's a taint of OCTG here. There's a whiff of OCTG here. That makes it a better number. And that, to me, is an abuse of discretion. The abuse here arises from the fact that at most, in your view, there's 4% OCTG produced by Bouchon. At most. And if you go through the categories, and we went through the website, and it said it could be large diameter pipe, it could be small diameter pipe. But if you go through the categories, those are, you know, large diameter pipe is listed as 0.72% of sales. Small diameter pipe is presumably less because it's not even listed. So this is tiny. And they have other types of pipe. So what we have here is a non-OCTG profit for Bouchon. But because Commerce said- At 4%, potentially. Potentially. But if, you know, 4% of a company's sales, if you're going to say their overall profit is a reasonable OCTG profit, and that justifies distorting overhead and G&A, I mean, I think that's irrational. And the judge below never looked at the argument that OCTG was insignificant for Bouchon, which is our main argument. I get the discretion. And I get why the judge said, you know, I complained about the preferences. I could see why he said, no, look, Commerce has to, you know, it's reasonable to have a preference. But the facts in this case, the substantial evidence on the record, when you look at the full record, it shows that Bouchon's OCTG production was insignificant. That's the basis for our argument. The final issue we have- One question, Mr. Winn, and I'll let you get to your final. Of all of these three issues, I don't want to sound crass here, but where does the money lie? What's the biggest one in terms of making a difference? Well, at this point, I'm a little lost. We have the mushroom insurance, which is what we call the insurance issue. I think we started out at a 23% dumping margin in the original determination. Commerce then changed from Wellspun to Bouchon, and it hit us with the mushroom, and we're now at 72%. From my point of view, however, we went into the determination saying, we're not dumping. That was our honest belief. We're not dumping. And to me, what this case is, is a lesson in how commerce says, we can make dumping here. We have, through this non-market economy methodology, there's things we can do to make dumping. And when we appealed it, I think, frankly, the mushroom insurance, commerce said, we'll make sure you're dumping. Even if you win your other two issues, this insurance will make sure you're dumping. Now, I presume bad faith by commerce. I know you are not permitted to, but I've been doing this for 34 years, and I think I'm probably right. In any event, we're here because we think we're not dumping. What do you think the most important issue for you is the insurance issue? Your Honor, I would not be here just to win the insurance issue. My goal, the only reason we're here is because we think we're not dumping, and I believe in order to establish we're not dumping, we need to win all three. That's my sense of the calculations. What I said was I've been doing it for 25 years. I defer to your experience, then. No, but I have a pretty good idea of the standard of review. Well, that's why we're not asking you to make a finding of bad faith. I'm asking you to say commerce's determination that the blue shine profit was reasonable because it's an OCTG profit is not supported by substantial evidence on the record. That is my legal argument on that issue. Get a B&H. Sure. Apparently, that's what bothers me the most. That's where we started out being bothered. It gets worse. You're not bothered anymore? Well, actually, I'm running out of time,  Commerce didn't apply Judge Rustani's rulings in C.S. Wynne and Dejan, and they were on remand, and Commerce had issued a draft remand decision agreeing with her, and yet in our case, they said, well, that's not fine, and we don't have to follow it. I thought this was absurd, so I asked the judge for a remand. Well, it's also, I mean, it's absurd as a matter of law and logic. Yes. I am 100% with you on that, and beyond that, there is only one piece of evidence on the record as to how Indian brokerage companies actually charge for these services, and that's a price list we submitted from a company called OOCL, something overseas container line, I think, and those show that actually these services are charged based on transactions. Why would you document that? What strikes me, and I'm going to ask the government about this, is that you have to fill in a form, and you write the number, and it says tons, and you write the number 10, or you write the number 1,000. It really isn't that much more work to add two zeros. Yes. Your Honor, with that, I agree with you 100%, and beyond that, the record evidence, as Commerce itself admitted, there was no evidence that anyone in India or Vietnam charged for document preparation and customs clearance on a per-ton basis. The only evidence was the price list we submitted, which showed it was a per-transaction. So if you want to decide this is a matter of logic or as a matter of substantial evidence, I don't see how you can come out. I would reserve whatever time I have for rebuttal, but I'm not sure I have it. We'll save you rebuttal time. Let's hear from the other side. Thank you. Mr. Edelstein. Good morning, Your Honors, and may it please the Court. Let me start with B&H. Certainly, Your Honor. The argument was just made to Your Honors that the only evidence of brokerage and handling charges was the OOCL, or I'll call it OOCL, information. Commerce found that that data was not contemporaneous. On page 7 of the final determination, I don't have an appendix site for that right now, but that was not contemporaneous information. Instead, Commerce relied upon the Doing Business Report at Appendix 1998 and the GVN data at Appendix 1764. There was, to be fair, record evidence going both ways on the B&H issue, and ultimately what tipped the scales for Commerce on this issue was CEIA's own commercial experience of paying B&H costs by weight. Commerce looked at the freight forwarding contract at Appendix 705 that CEIA submitted on the record. So there was some evidence going both ways. Commerce tipped the scales in weighing that evidence in accordance with CEIA's own commercial experience, and that was a rational judgment. You say on page 20 of the record, Commerce reasonably determined that B&H costs should be allocated by weight based on substantial record evidence, including SSV's cost, are or could be allocated by weight. Explaining how finding facts that are or could be true is substantial evidence and not speculation. Well, Your Honor, for example, the— are you asking about the valuation or the fact that they— I don't understand Your Honor's question. I'm sorry. What I'm asking about is the phrase are or could be allocated by weight. Right. So CEIA's own contract allocated by weight. They— Where? You say, where's record evidence that directly supports SSV or Indian companies having paid for document or customs procedures by weight. For document or customs procedures, not transportation. Well, document and—those are a form of brokerage and handling costs. So what we're talking about here is an inference that Commerce drew from the— Do you think it's a fair inference? No, Your Honor, because— I agree. Just because it's not an unfair inference. If Commerce relies upon evidence of brokerage and handling expenses in India, which is a category of expenses that includes the particular type of clearance and documentation expenses that are at issue— If you ship 10 tons of something and they charge you by the ton, and that includes some paperwork, is that different than when you hire a customs clearance company and you say, I want to ship 10 tons or I want to ship 1,000 tons, and the only difference is when they fill in the forms, there are two extra zeros, what I posited to your friend. I mean, that strikes me as unrealistic. Well, Your Honor, it may be imperfect, but there were a lot of imperfect issues in this case, and it is up to the interested parties to make the record. There was no contemporaneous evidence on this record. But there was evidence. There was non-contemporaneous evidence that— That was the only evidence. No, Your Honor. The doing business report showed brokerage and handling expenses being allocated by weight at Appendix 1998, and there was GVN data, which showed five different categories of B&H expenses, and some were charged by weight, some were not charged by weight. There was substantial evidence going both ways, and ultimately— Substantial evidence that they allocated by weight. Or by transaction. We're looking for substantial evidence that this is a correct brokerage allocation by commerce. There was substantial evidence—that's right, Your Honor—going both ways, that in India you could have brokerage and handling expenses in two different ways. It could be by weight, or it could be charged by transaction. Show me one where it's not involving transportation. It's simply involving an expediter at the port who charges by weight. Your Honor, we're not talking about charges at the port. I understand. Document preparation was charged by the weight of the subject matter that was the subject of the documents. Right. That's the problem. The record evidence was that in India it's done both ways, Your Honor. And commerce— Show me in the record where it's purely document preparation, and it's done by weight. Your Honor, there is no contemporaneous evidence in the record on that issue. And so commerce, using the best information available— No, Your Honor. No, Your Honor. Document preparation is a form of brokerage and handling expenses. And just because they didn't have a granular level of data available to commerce, they used the best available, which was the more general— You know, BAI gives you a lot of leeway. As I said to your friend, I've been looking at this stuff for a long time. But it doesn't let you just imagine things. Well, Your Honor, there's no imagination. Commerce went, instead of looking for the data that was not available for the specific kind of B&H costs, commerce went to the more general type of B&H costs, which were on the record, and drew a reasonable inference that that was evidence, contemporaneous evidence, of the cost by weight. And, Your Honor, you talked about the standard of review a few moments ago. The standard of review allows commerce to use— When we're looking for the best available evidence on the record, there was no evidence of the—contemporaneous evidence of the specific category, so they went to the more general category. And that's an appropriate inference to be drawn from the record evidence. I would think the more general category would not be by weight, but by whatever else—time involved or the amount of paperwork. Well, this record, Your Honor, demonstrated that in the case of India, the experience was there was evidence going both ways, Your Honor. And there was a broad doing business report that reflected broad practice in India, which did indicate charging by weight. Let's talk about the common law. Sure. Your Honor, SIA has— The commerce changed its position. In response to the Court of International Trades' remand, which said, commerce, you are assuming that Indian law provides for something without any evidence. Go back and look and see is there any record evidence to support whether Indian freight contracts include— I love this stuff, you know, because it's all—I refer to it as English common law. But if you look, the common law countries all cite each other, you know, so you can just rely on American common law and you'll be okay. Your Honor, it was—SIA's argument based on Indian common law is an assumption without evidence. SIA had— If I leave my bags in the train station baggage depot when the depot master is the bailey and I recover them and go on my way, do I have to report separate insurance policy? I received his income. Your Honor, I have no idea. But the point here, Your Honor, is SIA had the burden of making the record of what constitutes Indian freight forwarding practice or Indian law. They could have submitted a declaration from an Indian lawyer to establish what is Indian law on this subject. That's usually how it's done. Precisely, Your Honor. And SIA did not avail itself of that opportunity, never made the record. So when it came time for Commerce to make a judgment, they were directed by the Court of International Trade appropriately to rely upon record evidence. There was no record evidence of that, no record evidence supporting the assumption. Well, you did have at that point the Indian law cases were submitted to you. Your Honor, all we have is the—in SIA's appellate brief, there's a citation to something that appears to be an Indian case. Those weren't raised to the law. Your Honor, I am not aware of Commerce addressing that. So to my memory, the answer is no. I'll ask a friend that. You know, I mean, I agree with you. Normally what you get is one of these special master inquiry kind of things. Or just a simple declaration from an Indian lawyer saying this is the law. I mean, the point is, Your Honor, we just don't know on this record. There's no evidence. And so there's no evidence of the Indian law. There's no evidence of the double counting. And as Commerce found and the trial court held, there's just no support for this argument. Ultimately, under QBD food, it was SIA's burden to establish that it wasn't established here. It's an issue with a burden. And if I could just very briefly address the financial— Can I ask you one question? Yes. Let me see if we can turn the hands of time back to the B&H issue for a second. What's the government's view of those two decisions by Judge Rustani? I guess it's C.S. Wind and DuPont. Is it DuPont? What's the other one? I think so. Yeah, those two cases. They seem to me to be fairly persuasive. I realize they don't bind us in any way. But what is the government's view of those two cases on that issue? And you did abide by them. Your Honor, with respect to the B&H issue, I believe it's record specific. And it turns upon what was the best available evidence on this particular record. So I can't comment on those other two cases because they involve different records. But here, there was a mixed record of evidence going both ways on the best available contemporaneous evidence, which was of B&H costs in India. So you're saying you don't have a problem with those cases on their records, but here we have a different record. Your Honor, the question of whether those cases appropriately followed the standard of review and afforded the proper deference to Commerce is probably for another day, Your Honor. But I would just say that this court should follow the standard of review. And this administrative record demonstrates that Commerce reasonably relied upon the best available record evidence that it had available that was contemporaneous, and Commerce made a reasonable judgment in that regard. May I briefly comment on the financial statement issue? Yes, but do be brief. With respect to the choice of Bouchon versus Wellspun or Apollo, there was no evidence on the administrative record that either Wellspun or Apollo made OCTG during the relevant time. Commerce has a well-established preference for using identical merchandise when selecting financial statements. That's in their regulation. And ultimately, before Commerce, CIA conceded that OCTG did constitute a portion of Bouchon's sales. That's in Appendix 2760. But they just argued... They conceded something like 0.29% or something like that? No, Your Honor. They conceded that it was up to 10%. They've argued here, and they argued in the Court of International Trade, that it was a tiny, insignificant... Where do you have the 10% in the record? Appendix 2760, Your Honor. 2760, okay. So CIA argued that it was no more than 10%. But they conceded it was a portion. They just argued, oh, less than 10%. That's a tiny portion. Well, that's not conceding up to 10%. Well, the argument said that it was a tiny portion up to 10%. I believe they quoted this excerpt from the record in their reply brief. So ultimately, Commerce did not agree. Commerce concluded that some OCTG was better than no OCTG. And there were a number of imperfect options available on this record. Commerce ultimately made a rational judgment call, and the court should not second-guess it under the deferential standard. 2760? I believe so, Your Honor. I'm not finding it. Oh, here it is. No? Let's see. Here it is. Here it is. It's also quoted in full on page 18 of the CIA's reply brief, if that helps. Let's see. They say that the Bouchon financials demonstrate that pipe production as a whole, including OCTG production, constitutes a tiny portion of Bouchon's overall operations, with sales representing less than 10%. I don't see that on 2760. What I see is together the sales of these pipe products represented only 8.7% of Bouchon's total sales. And that's precision and large diameter taken together. I know how you guys are. It could be the next page. If there's nothing further, because Commerce calculated surrogate value based on reasonable judgments and record evidence, the best available record evidence available, the court should affirm. Thank you. OK. Thank you. We'll hear from Mr. Bullion. Whatever new you have to tell us. Sure, absolutely, Your Honor. What we've already covered. I do want to answer some of the court's questions on record evidence, though. I think, Judge Walk, you had raised that it's somewhat illogical for a company to contract somebody to have somebody fill out a form based upon tonnage. And I would just point, Your Honor, to SSV's freight forwarding contract, which does contract for that. Can you show me that page, please? Sure. So if you look at Appendix 704 and 705, and, of course, this is business proprietary in total, except for some of the portions that were made public in the underlying opinion. But there you can see that the contract, if you look at the prices charged, which include what we're talking about here, are prices on a week basis. And so that's a piece of record evidence. And the other piece that Mr. Adelsheik had pointed out, and I just want to make sure that we have the precise citation to the record, is the GBN submission, which shows what Indian Company's experience was. And this is Appendix 1764. And this shows that agency charges were on a per metric ton basis. Wait a minute. Back up. Yes. 705. Yes. Arranging and finishing customs declaration. Yes. OK. Transportation cargo. Yes. This is a transportation contract, isn't it? But it includes what we're talking about, Your Honor. Oh, give me a break. Give me a break. Your Honor, this was the record evidence that was before Commerce. And so when Judge Goldberg said—  No. When Judge Goldberg said— Don't interrupt me, counsel. I'm sorry, Your Honor. This is what I raised with your friend from the government. This is transportation. Sure, sure, they do it by the ton. Show me one where it's not transportation. And I was getting to that, Your Honor. I'm sorry. So 1764. If we look at— What is that, 1764? 1764, Judge Schall. This is a submission made in oil country tubular goods from India. So same product and producer was in India. And here you have a question that was being posed by Commerce, and they were asking, you know, can you explain what all these expenses are in your brokerage and handling that you've reported to us? And there, GVN states, we provide you with a few expenses, and here's the total expenses on the invoice. And here you can see agency charges, which are on a per metric ton basis. So— Show me that. I'm sorry, Your Honor. It's on Appendix 1764. Right in the middle of the page, there's the A through E sequential. Yeah. A says agency charges, rupees per metric ton. And so, Your Honor, I'm submitting to you that there is a piece of record evidence which suggests that— What does B say? B has shipping bill, and this is what Mr. Edelshoek was saying. And how much is it? And that is on a per shipping bill basis. What Mr. Edelshoek is saying is that a portion of the record— What does E say? Agency charges. E. I'm sorry. E is bill of lading charges. M. That's one type of document production. But agency charges were on a per metric ton basis. And so all I'm suggesting to Your Honor is that there is a mixed record here. And what Commerce was doing was they were saying SSV's contract includes both, and it's on a per ton basis. GVN's experience, they're in the surrogate country. It's on a per ton basis and a per shipping bill basis. But then we have the surrogate value from the surrogate country, which is on a per ton basis for everything. And so that matches up really nicely with what we have with SSV. Let me ask you this about your client. Does U.S. Steel routinely book separately inland insurance on shipments within the United States? U.S. Steel will absolutely insure its shipments on freight because there is no— Separately? Yes, because there is no guarantee that that trucking company has enough to support a loss or damage. And so just like we would with our health insurance, there may be things that we add to it to say, Hey, that health insurance over there doesn't necessarily cover us for what we'd like over here. Right? That's right. Your Honor, what I'm suggesting is that had we had a full record developed here, maybe there would be a clear point that Commerce can say absolutely with certainty. Here we've got a mixed question. This, I would submit to you, is not the type of case that this court normally weighs in and says, No, no, no, Commerce, we're second-guessing you on this one. They usually get a lot of leeway. They do, under the standard of review. And this court has said, and we raised in our reply brief, that it is a— you've made it clear over the last 30 years of this court that it is a high standard on substantial evidence. And this is the question before this court. So I just wanted to raise that. It's not British common law. It's English common law. Right, Your Honor. Mr. Milner, one question. What are agency charges? So unclear, right? And I think that this is where, again, it's mixed as between which components. If a particular company would invoice you, they might invoice you on a per-ton basis, which may, to Your Honor's point, you know, you said it defies logic, but it may not because as tonnage increases, maybe the value also increases. And so maybe there's an element of value associated with the shipment that the company who's doing the work will say, Hey, we want to get this right because there's a lot of value here. And so we're going to do it on a per-ton basis. Whereas maybe, to Your Honor's point, with a shipping bill where you just fill out another zero, that they may say, Well, you know, we don't necessarily need to do that because it's one piece of paper for each shipment. And so it may not be on a per-ton basis. Which is why we do comparables in a market economy where somebody else will come in and say, Well, I won't charge you that. Right, but I think what happened here was that commerce sees the GVN experience. It's both. Commerce sees a doing business in India report. It's weight-based. And commerce looks at SSV's contract and sees weight-based. And so they're saying, That's their experience. We need a surrogate. Weight-based. And, oh, by the way, we have this other point for you, Judge Goldberg, and we have this other point for you, Your Honors, on this court. And that's the substantial evidence issue here. And again, Your Honor, had Mr. Wynton provided sufficient information to show the insurance aspect in India that nobody gets insurance for trucking expenses, then that would be a different question. And then commerce might not have the substantial evidence at that point. So thank you, Your Honors. I really appreciate the opportunity. Any more questions? Thank you. I've had enough fun. Is that fun? Yes, sir. Have you rebelled to Mr. Wynton? Thank you. Let's have some more fun. I love this. Let me begin by talking about brokerage and handling. Commerce wants you to think of brokerage and handling as one thing. But, in fact, the doing business report that they relied on did not have one thing. It had three things. One was document preparation. One was customs clearance. The third was something called port and terminal handling. And you might imagine that if you're moving OCTG around a port, the cost for that would vary by time. And we have not objected to allocating those costs by time. We're saying there were three items. Document preparation, customs clearance should be allocated based on transactions, whereas moving it around the port should be based on times. The Council for Government said that the doing business report shows that the costs were allocated by weight. That is absolutely untrue. The doing business report had a sample shipment, one container, 10 tons of textiles and spices with a value of $20,000. It doesn't tell you how it would go up if it were 20 tons or 100 tons or 1,000 tons. It simply isn't relevant. But it does break the item down into three pieces. And we're talking about how you allocate the first two. Council said that the GVN lists five things, some of which are allocated based on transactions. So some are allocated based on weight, but we don't know what those are. In fact, Commerce itself said, we agree with SSV that there's no record evidence as to the two GVN items, agency charges and other charges, various expenses may have been. It could have been moving things around the port. We don't know. But we do know that the only evidence on the record about how things are charged for document preparation and customs clearance is it's per transaction, not per weight. The government wants to say, well, it's not contemporaneous because our price list was after the investigation period. But it's record evidence. And it's the only record evidence. It doesn't cease to be record evidence. If you had contemporaneous evidence. Did you put in evidence of Indian law below and in some other fashion? We argued this before Commerce. Again, this issue kind of blindsided us. We couldn't believe Judge Goldberg was going to remand on this. Commerce had agreed with us. It came up. We addressed this in our comments on Commerce's draft remand determination. It doesn't appear to be on the record in the appendix. We can supplement that if you'd like. But in our June 23, 2017 comments on remand at page 4, we laid out the Indian law. I remind you as well, foreign law is not a question of fact. It is not a question of evidence. Under the Federal Rules of Civil Procedure, it's a question of law to be determined by the court. And while we all have ideas about bringing masters, that's not necessary. Under the Federal Rules of Civil Procedure, it's not necessary. Under the Court of International Trade Rules, it's not necessary. Also add, again, the government wants to blame us for not creating a record. But they didn't open the record on this issue. They didn't say to us, when the judge remanded and said, where's the evidence on the record? They didn't say, hey, guys, give us evidence on the record. We could submit legal arguments. Commerce is very strict about if we submit anything, textbooks, anything, they say that's new factual information, we're not going to accept it. So we could only cite legal materials, which we did, which they ignored. The last issue on the profit. When we submitted our comments to Commerce, we looked at it, we said, you know, there's this precision. Just all tubes all together was 10%. That's a small portion, and that's what we told Commerce. Commerce didn't say 10% is enough. Then when we looked at it further, we said, actually, you know, we look at the website information, which was on the record, and it says precision tubes doesn't include OCTG. OCTG is another category. So when we refined it, we get even smaller numbers. Whether you say it's 10% OCTG or 4% OCTG or 0% OCTG, when you're saying that we have Bouchon's overall profit, right, its overall profit number, which is 90 or 96 or 100% not OCTG, and you should use that number, even though you know it distorts everything else because we need an OCTG number, I think you're crazy. I do. It's not a reasonable approach. Commerce, we heard, has a preference for using profit for the identical merchandise. That's absolutely true. They also have a longstanding preference for using profit for companies with the same production process, right? If you followed that preference, you would say we don't use Bouchon. If you follow the preference for using the same product, you really don't use Bouchon. But if Bouchon actually had a profit number for OCTG, then you'd have to say which of these preferences do we favor here. But our argument, and the judge below said, if you're asking me to say which of these preferences should we favor, that's commerce's business. I'm not getting involved in that. But what we're saying is the latter preference for using an OCTG profit doesn't come into play here because the Bouchon profit, in any reasonable sense, is not an OCTG profit. And so commerce chose to use its discretion to distort overhead, to distort SG&A, to distort interest expenses in order not to have an OCTG profit. I don't see the logic of that. Unless there are any other questions, I appreciate your time. I have one question. Sure. Go for it. Okay. Okay, thank you. Before I sit down, do you want us to submit on the record where we addressed the Indian law before commerce? I don't believe it's in the appendix. It wouldn't hurt if it's in the record. It's not in the appendix, but it is in the record.  Do you have a question for Mr. Adelshick? Yes. Mr. Adelshick, we have a question for you. Would you approach the podium so that we get it on the microphone? I have a factual question. Was your friend correct that the INA could not submit new evidence of Indian law except for citing the law itself? It wasn't reopened to permit them to do that. Your Honor, they never asked. They never asked. Okay. Okay, thank you. Thank you all. The case is taken under submission.